IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ANGELA R. SHEWARD, | CASE NO. 1:24-cv-2240 |
| Plaintiff, | DISTRICT JUDGE |
| | DONALD C. NUGENT |
| vs. | |
| | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | JAMES E. GRIMES JR. |
| SECURITY, | |
| Defendant. | **REPORT &** |
| | **RECOMMENDATION** |

Plaintiff Angela Sheward filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits, disabled widow's benefits, and supplemental security income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

Near the end of 2021, Sheward filed applications for disability insurance benefits, disabled widow's benefits, and supplemental security income, alleging

a disability onset date of July 2, 2018.[1] Tr. 315–30. In her applications, Sheward claimed disability due to bipolar disorder, depression, arthritis in her back, and anxiety. Tr. 376. The Social Security Administration denied Sheward's applications and her motions for reconsideration. Tr. 108–10, 141–43. Sheward then requested a hearing before an Administrative Law Judge (ALJ). Tr. 197.

In November 2023, an ALJ held a hearing. Sheward and a vocational expert testified, Tr. 31–75, and Sheward amended her alleged onset date to December 21, 2021, Tr. 17, 47. In January 2024, the ALJ issued a written decision finding that Sheward was not disabled. Tr. 17–33. The ALJ's decision became final on November 6, 2024, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Sheward filed this action on December 26, 2024. Doc. 1. She asserts the following assignment of error:

> Whether the ALJ erred when failing to identify substantial evidence supporting the residual functional capacity finding and erred in h[er] evaluation of the medical opinions and prior administrative medical findings.

Doc. 9, at 1.

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

**Evidence**

*Personal and vocational evidence*

Sheward was 50 years old on her amended alleged disability onset date. Tr. 31. She graduated from high school and used to work in a factory. Tr. 377.

*Relevant medical evidence*

In October 2018, Sheward went to the emergency room for back pain that radiated down her right leg. Tr. 472. She said that the night before her visit, she fell off the fourth rung of a ladder and hit her lower back on a shelf. Tr. 472. An exam showed that Sheward had mild paraspinal tenderness in her lumbar areas, normal range of motion, and no edema. Tr. 474. X-rays were negative for a fracture but "chronic changes were noted." Tr. 475.

In January 2019, Sheward went to her family medical practice and reported back pain since her fall in October 2018. Tr. 470. She said that she hadn't been to a doctor in a few years. Tr. 470. Sheward's exam findings showed pain to palpation of her lower lumbosacral area and with flexion and extension of her back. Tr. 470. Her joints were "grossly normal." Tr. 470. Sheward refused a course of steroids, medication, and physical therapy. Tr. 471. She requested a referral to a neurologist, which the provider supplied. Tr. 471.

In April 2019, Sheward saw neurologist William Bauer, M.D., for lower back pain that radiated to her legs. Tr. 501. Sheward reported that her pain had developed gradually several years before the appointment. Tr. 501. Her pain was constant and had progressively worsened, and was aggravated by

bending, lifting, and prolonged standing. Tr. 501. Dr. Bauer referenced an undated lumbar MRI in Sheward's records that indicated a herniated disc. Tr. 501. On exam, Sheward had tenderness over her lower abdomen and at L5-S1.[2] Tr. 503. She had positive straight leg raise testing, right more than left; flattening of the lumbosacral spine; paralumbar spasm; and absent ankle reflexes. Tr. 503–04. Sheward's gait, station, and cerebellar function were normal. Tr. 504. She had normal motor strength and sensation. Tr. 504. Dr. Bauer administered lumbar-area trigger point injections. Tr. 501.

In May and June 2019, Dr. Bauer administered lumbar-area trigger point injections. Tr. 493, 497.

In August 2019, Sheward followed-up with Dr. Bauer for another round of trigger point injections. Tr. 489. Sheward reported that the injections provided more than 50 percent improvement in pain and lasted about a month. Tr. 489. On exam, she had a normal gait and was able to stand without difficulty. Tr. 492. Her other relevant findings were the same as her April visit. Tr. 491–92. Dr. Bauer administered trigger point injections. Tr. 489.

---

[2]     Vertebrae in a person's spine are given letter and number designations according to their location. The five vertebrae in the lower spine—the lumbar spine—are L1 through L5, and the five vertebrae at the bottom of the spine—in the sacrum—are labeled as S1 through S5. *See* Thomas Scioscia, MD, Vertebrae in the Vertebral Column, Spine-health Resources, https://www.spine-health.com/conditions/spine-anatomy/vertebrae-vertebral-column [https://perma.cc/R9MM-TBZT]; Thomas Scioscia, MD, Sacrum (Sacral Region), Spine-health Resources, https://www.spine-health.com/conditions/spine-anatomy/sacrum-sacral-region [https://perma.cc/S2BR-RBTB].

In October 2019, Sheward followed up with Dr. Bauer's office and saw a nurse practitioner. Tr. 485. Sheward reported worsening back pain "with mowing and walking." Tr. 485. She was out of her medication. Tr. 485. Her exam findings were unremarkable. Tr. 487. The provider wrote that Sheward "needs to start" physical therapy and referred her to psychology for depression. Tr. 487. The nurse counseled Sheward regarding a positive urine drug screen, which showed that she was taking medications that were not prescribed, and adjusted Sheward's medications. Tr. 487–88.

A week later, Dr. Bauer's office discharged Sheward as a patient because she had breached her pain contract and failed a urine drug screen. Tr. 593.

In January 2020, Sheward saw Jatinder Rana, M.D., at the Tiffin Psychiatry Center for depression, anxiety, mood lability, irritability, and past memories. Tr. 528–30. Sheward reported that she had been taking the medication Trileptal for two weeks, but it had not helped. Tr. 528. She said that she "continued to be fidgety, hyper, moody, [and] irritable." Tr. 528. Sheward said that she angered easily and became upset over little things, and she could not settle or calm down. Tr. 528. She couldn't fall asleep because her mind raced. Tr. 528. At times Sheward had panic attacks. Tr. 528. She reported difficulty focusing and paying attention and described a history of physical and emotional abuse from a past boyfriend. Tr. 528. Sheward said that she had not previously had counseling or medication for her mental health symptoms. Tr. 528. Dr. Rana's exam findings showed that Sheward was oriented and alert,

with a preoccupied demeanor, no attention difficulties, and avoidant eye contact. Tr. 529. Sheward had agitation and restless psychomotor activity and rapid and loud speech. Tr. 529. Her mood was dysphoric,[3] anxious, irritable, and depressed, and her affect was full but labile. Tr. 529. Sheward had racing and guarded thoughts, and she had cooperative, agitated, and withdrawn behaviors. Tr. 529. She had normal insight, good judgment, intact memory, and normal cognition. Tr. 529–30. Dr. Rana assessed bipolar II disorder, chronic post-traumatic stress disorder (PTSD), and anxiety disorder, and adjusted Sheward's medication. Tr. 530.

About two years later, in February 2022, Sheward saw Dr. Rana. Tr. 730. At the time of the appointment, Sheward was living with her brother and a friend and she was not on any medication. Tr. 780. Sheward reported that she had been feeling awful, angry, depressed, and anxious. Tr. 780. She had been crying, not doing anything; she had no appetite, and could not sleep. Tr. 780–81. These symptoms had worsened since September 2021, when Sheward's husband died in a motorcycle accident. Tr. 781. Sheward also felt withdrawn, isolated, and guilty. Tr. 781. Dr. Rana assessed adjustment disorder with depressed mood, prescribed Zoloft and Zyprexa, and recommended counseling. Tr. 781–82. Two weeks later, Sheward followed up

---

[3]     A dysphoric mood is disquiet, restlessness, or malaise. *See* Dorland's Illustrated Medical Dictionary 573 (33rd ed. 2020).

6

and reported the same symptoms, and Dr. Rana increased her medication. Tr. 779–80.

Sheward returned to Dr. Rana in March 2022. Tr. 778. Sheward reported that she was sleeping better and her appetite had improved. Tr. 778. Her crying spells were not as bad. Tr. 778. She described worrying during the daytime—she was scared and felt like people were out to get her in trouble and that her husband's family may take things from her. Tr. 778. Dr. Rana increased Sheward's Zyprexa dosage. Tr. 778.

In April 2022, Sheward saw Dr. Rana. Tr. 776. She was crying and said that she felt overwhelmed. Tr. 776. Sheward felt depressed, could not focus, and kept thinking about her dad, who passed away a few months before her husband. Tr. 776. She was anxious and became angry when thinking about how people stole from her home. Tr. 777. She had difficulty sleeping, her appetite had decreased, and she did not want to be around anyone. Tr. 777. Sheward had not started counseling. Tr. 777. Dr. Rana assessed adjustment disorder with mixed anxiety and depressed mood, and increased Sheward's Zyprexa dosage. Tr. 777.

In June 2022, Sheward told Dr. Rana that she was not tolerating Zyprexa—she felt too tired and sluggish. Tr. 774. She continued to feel depressed and did not feel like leaving her house. Tr. 774. She felt like everyone was watching her, knowing what happened, and she felt guilty and blamed herself for her husband's death. Tr. 774. On exam, Sheward was withdrawn,

preoccupied, inattentive, and easily distracted. Tr. 775. She was emotional and avoidant, anxious and depressed. Tr. 775. Sheward's affect was constricted and labile and she had racing thoughts. Tr. 775. Dr. Rana decreased Sheward's Zyprexa dosage and increased her Zoloft dosage. Tr. 776.

In December 2022, Sheward saw Semur Rajan, M.D. Tr. 765–66. Sheward was doing better on medication, although she reported that she was still crying, isolated, and not trusting anyone. Tr. 765. Dr. Rajan counselled Sheward on her bipolar disorder and taught her meditation and breathing exercises. Tr. 765–76.

In July 2023, x-rays of Sheward's lumbosacral spine showed "[g]rade 1 spondylosis L5 on S1 secondary to bilateral spondylolsysis," which was similar to the 2018 imaging, and "[p]rogressive degenerative disc changes at the L5-S1 level." Tr. 805–06.

In September 2023, Dr. Rajan wrote that Sheward had "improved quite considerably" with medication. Tr. 841. She was a little more sociable with family and counseling had helped. Tr. 843. She still did not have many friends. Tr. 843. Dr. Rajan wrote that Sheward was unable to work due to her mental state. Tr. 843. Sheward's problem list included anxiety, depression, bipolar disorder, forgetfulness, sleep disorder, nicotine addiction, and lower back pain. Tr. 841.

*Opinion evidence*

*Treating providers*. In May 2023, Dr. Rajan completed a treating source statement for physical conditions on Sheward's behalf. Tr. 768–71. Dr. Rajan indicated that he had treated Sheward since October 2022 for anxiety, depression, bipolar disorder, sleep disorder, nicotine addiction, and lower back pain. Tr. 768. He opined that Sheward would be off task more than 25 percent of a workday and could only maintain attention and concentration for less than five minutes at a time. Tr. 768. Sheward's impairments would cause her to miss four or more days of work per month. Tr. 768. According to Dr. Rajan, due to all of her impairments, Sheward could rarely (i.e., up to five percent of an eight-hour workday) lift and carry any weight—from zero to more than 100 pounds. Tr. 769. Due "mostly" to her mental impairments, Sheward could sit, stand, and walk for less than an hour and required an at-will, sit-stand option. Tr. 769. Sheward would often need to lie down or recline throughout the day for hours. Tr. 769. She wouldn't need a cane, she wouldn't need to elevate her legs, and she had no issues using her hands or feet. Tr. 770. As for postural and environmental limitations, Dr. Rajan opined that these were "N.A.," or not applicable, but also that Sheward could "never" perform postural activities or be exposed to environmental hazards. Tr. 771.

*Consultative examiners*. In June 2022, Sheward saw consultative examiner Mark Weaver, M.D., for a physical evaluation. Tr. 734–43. Dr. Weaver wrote that Sheward "was a somewhat poor medical historian … only

able to give scanty, sparse medical background concerning her present complaints." Tr. 734. "From what could be gathered today," Dr. Weaver wrote, Sheward complained of lower back problems which had been present for "many years." Tr. 734. Sheward said that for this problem she had only had a pain management consultation, had not tried physical therapy, and was at the time of her visit receiving no treatment. Tr. 734. She reported frequent back pain and leg numbness that limited her capacity for sustained sitting, standing, walking, lifting, and carrying, "although she could not further quantify these limitations." Tr. 734. Sheward told Dr. Weaver that she was diagnosed with PTSD, bipolar disorder, and depression, and that she felt anxious in crowds. Tr. 734. She said that these issues caused problems "following directions and travel[ing]." Tr. 735.

Dr. Weaver's exam findings showed that Sheward retained normal strength and range of motion in her arms and legs. Tr. 735, 742. She had a constant, mild, involuntary spasm on inspection and palpation of her lumbar paravertebral musculature with tenderness to palpation over her lower back area, left side greater than right. Tr. 735, 742. Her dorsolumbar spine range of motion was restricted and she complained of pain on extremes of motion. Tr. 737, 739. Sheward's straight leg raise testing was negative. Tr. 737, 741. Sheward exhibited a "stiff gait with low back pain." Tr. 741.

Dr. Weaver also conducted a mental status examination. Tr. 737. He commented that Sheward demonstrated a somewhat nervous, anxious affect,

and appeared less than completely alert while being oriented. Tr. 737. Sheward exhibited "flight of thought and difficulty staying on subject," frequent difficulty with concentration, and difficulty following directions. Tr. 737–38. Dr. Weaver opined that "in view of [Sheward's] low back problems and mental difficulties, she would probably be limited in the performance of physical activities involving sustained sitting, standing, walking, lifting, carrying, following directions, and travel." Tr. 738. He wrote that Sheward "would probably be able to perform … handling objects, speaking, and hearing." Tr. 738.

In October 2022, Sheward saw Sudhir Dubey, PsyD., for a psychological consultative exam. Tr. 744–49. Sheward reported memory problems for one year, depression for five years, and concentration issues since childhood. Tr. 744. Her depression had worsened since her husband's death. Tr. 744. Sheward described feeling down and depressed and had difficulty sleeping. Tr. 745. She recalled her medications and said that she found them helpful. Tr. 745. Sheward indicated that she was able to take care of herself doing basic activities of daily living, shopping, managing money, taking medications, maintaining a schedule, driving, and doing paperwork. Tr. 746. Her activities included reading, writing, and listening to music. Tr. 746. Dr. Dubey remarked that Sheward's eye contact was minimal and she "appeared somewhat tense and anxious." Tr. 746. Sheward's speech was unremarkable and her thoughts were logical. Tr. 247. Sheward was oriented to person, place, time, and

11

situation; exhibited alert and responsive behavior; and had no attention problems. Tr. 746. She did not need simple directions or multi-step directions or questions repeated. Tr. 746. Sheward's recall of past and recent events was unremarkable. Tr. 746. Sheward "was able to do six digits forward, zero digits backward." Tr. 747. She could recall one of three objects after a five-minute delay. Tr. 747. Her fund of knowledge was below average and Dr. Dubey estimated that at that time, Sheward's cognitive functioning was in the low-average range. Tr. 747.

Dr. Dubey concluded that Sheward could independently understand, remember, and carry out simple and multi-step instructions. Tr. 748. She could independently maintain concentration, attention and pace to remember and carry out simple tasks. Tr. 749. Sheward would have some difficulty independently doing so with multi-step tasks, but she could perform these tasks with supervision. Tr. 749. Dr. Dubey opined that Sheward would have "some difficulties" dealing with supervision or coworkers and with work pressure, "which would create some frustration for her, coworkers, and supervisors." Tr. 749.

*State agency opinions.*[4] In July 2022, Mehr Siddiqui, M.D., reviewed Sheward's record. Tr. 77–79. Regarding Sheward's physical residual functional capacity (RFC),[5] Dr. Siddiqui opined that Sheward was limited to the light level of exertion—she could stand, walk, and sit for about six hours in an eight-hour workday and lift and carry 20 pounds occasionally and ten pounds frequently. Tr. 81. Dr. Siddiqui also assessed postural and environmental limitations. Tr. 82. In February 2023, Scott Bolz, M.D., agreed with Dr. Siddiqui's assessment. Tr. 111–17.

In October 2022, David Dietz, Ph.D., reviewed Sheward's record. Tr. 77–79, 81. Regarding Sheward's mental RFC, Dr. Dietz found that Sheward could complete tasks that entail simple, concrete, and short instructions. Tr. 83. She could "complete tasks without a sustained production pace or stringent daily quota and in a setting where there is some flexibility as to the scheduling of breaks." Tr. 83. Dr. Dietz wrote that Sheward "appeared to have the ability to

---

[4] When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[5] An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

maintain social interaction with" others, but "might perform better at a job requiring limited interactions with people and the public." Tr. 84. Dr. Dietz found that Sheward could "adapt and manage herself in a structured and predictable work setting, where major changes are explained" and "given time while she adjusts to new expectations." Tr. 84. In March 2023, Alvin Smith, Ph.D., reviewed the record and affirmed Dr. Dietz's assessment. Tr. 111–18.

*Hearing testimony*

Sheward, who was represented by counsel, testified at the telephonic administrative hearing held in November 2023. Sheward stated that her lower back pain affects her ability to twist, push, pull, bend, and lift. Tr. 57. She listed her treatment as x-rays, injections, and medication. Tr. 57. She tried physical therapy "a long time ago." Tr. 58. From a mental standpoint, Sheward said that she couldn't work because she could not remember, focus or concentrate. Tr. 60. She said that she stopped seeing a psychiatrist because she moved, and her primary-care doctor prescribes her the same medication. Tr. 61.

The ALJ discussed with the vocational expert Sheward's past work as a painter, cleaner, laminator, machine operator, glass inspector, and door assembler. Tr. 64–65. The ALJ asked the vocational expert to determine whether a hypothetical individual such as Sheward could perform Sheward's past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 65–66. The vocational

expert answered that such an individual could not perform Sheward's past work, but could perform the following jobs: clothing sorter, inspector, and electronics worker. Tr. 66.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.
>
> 2. It was previously found that the claimant is the unmarried widow of the deceased insured worker and has attained the age of 50. The claimant met the non-disability requirements for disabled widow's benefits set forth in section 202(e) of the Social Security Act.
>
> 3. The prescribed period ends on September 30, 2028.
>
> 4. The claimant has not engaged in substantial gainful activity since December 21, 2021, the amended alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).
>
> 5. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine; bipolar II disorder; post-traumatic stress disorder; major depressive disorder; and generalized anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).
>
> 6. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

7.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, or crawl; avoid dangerous work place hazards such as unprotected heights or dangerous moving machinery; is able to carry out simple instructions that do not involve detailed or complex decision making or judgment; can tolerate occasional changes in a routine work setting; and can have occasional interaction with coworkers, supervisors, and the general public.

8.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

9.  The claimant was … 50 years old, which is defined as an individual closely approaching advanced age, on the amended alleged disability onset date (20 CFR 404.1563 and 416.963).

10.  The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

11.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

12.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

13.   The claimant has not been under a disability, as defined in the Social Security Act, from December 21, 2021, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 20–32.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1.   Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2.   Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3.   Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4.   What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not

> disabled. If not, the ALJ proceeds to the next step.
>
> 5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court ... asks whether" the "existing administrative record ... contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. at 103. Substantial evidence "is 'more than

18

a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings ... as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

Sheward argues that the ALJ failed to identify substantial evidence to support the RFC assessment and erred when he evaluated the opinion evidence. Doc. 9, at 11.

The Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, and extent;

19

specialization; and other factors. 20 C.F.R. §§ 416.920c(a), 416.920c(c)(1)–(5). Supportability and consistency are the most important factors. 20 C.F.R. § 416.920c(a). Supportability means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[] … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). Consistency means "[t]he more consistent a medical opinion[] … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] … will be." 20 C.F.R. § 416.920c(c)(2). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining factors. *Id*. (citing § 404.1520c(b)(2)).

As an initial matter, Sheward's brief is long on generalizations and short on specifics. To the extent that Sheward describes with specificity what errors she believes the ALJ made, I consider them below.

### A. Mental impairments

Sheward complains that the ALJ compared the opinions of the state agency reviewers, Drs. Dietz and Smith, "primarily to the examination findings of consultative examiner Dr. Dubey, but the ALJ did not acknowledge

20

the greater limitations and abnormal examination findings found by Dr. Dubey." Doc. 9, at 14 (citing Tr. 29); *see also* Doc. 9, at 18. The ALJ discussed the mental-impairment opinions by Drs. Dietz and Smith and explained:

> These opinions are partially persuasive. They are consistent with one another. There is evidence to support moderate concentration and interaction limitations. The claimant has difficulty being social and leaving her home. However, she is able to interact appropriately with providers, get along with her brother, she reported having friends at times but that she generally stayed home and help to herself. There were some instances of limited eye contact, but she generally exhibited normal behavior. Similarly, she was mainly able to participate, follow directions, and manage her own medical treatment. There was one note of low intelligence, but the claimant largely exhibited normal memory and the ability to participate and follow instructions by providers. She indicated she could manage her only daily activities. Dr. Dubey noted the claimant was oriented, exhibited alert and responsive behavior, had no attention problems, did not need simple directions or questions repeated, did not need multi-step directions or questions repeated, and was able to recall past and present events. Therefore, only mild limitation in adaptation and understanding, remembering, and applying information is supported. These are partly persuasive.

Tr. 29. Elsewhere in her decision,[6] the ALJ acknowledged some of the abnormal findings that Dr. Dubey observed. Tr. 27 (the ALJ commenting that Dr. Dubey wrote that Sheward had "minimal" eye contact, "appeared

---

[6]     The ALJ's decision must be read as a whole, *see Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014), and the ALJ is not required to repeat factual findings made elsewhere in the decision, *see Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014).

somewhat tense and anxious," and that "Sheward's cognitive functioning at that time appeared to be in the low average range."); Tr. 746–47. And the ALJ referenced these findings in the passage above. So the ALJ "acknowledge[d] the greater limitations and abnormal examination findings found by Dr. Dubey," *see* Doc. 9, at 14, 18; Tr. 27, 29.

Sheward argues that "[w]hen evaluating Dr. Dubey's opinion, ... the ALJ mischaracterized the record as showing 'mostly normal mental status findings, the claimant's ability to independently carry out her daily activities, and her improvement with conservative treatment.'" Doc. 9, at 14 (citing Tr. 29, 744–50), Doc. 9, at 19. But Dr. Dubey wrote that Sheward reported taking medication and that it was helpful, and that Sheward could care for herself independently by performing activities of daily living such as shopping, managing money, taking medications, maintaining a schedule, driving a car, doing paperwork, reading, and writing, Tr. 746–48, as the ALJ noted, Tr. 28, 29. So the ALJ's reference to Sheward's activities and improvement with conservative treatment was accurate. Indeed, elsewhere in the decision, the ALJ explained that medication and counseling had helped Sheward's symptoms, Tr. 27, 28, a finding that Sheward does not challenge.[7] *See also*

---

[7]     In her reply brief, Doc. 14, at 2, Sheward dissociates herself from the statement she made in her opening brief that "the ALJ mischaracterized the record as showing ... the claimant's ability to independently carry out her daily activities," Doc. 9, at 14. She then launches a new argument attacking the relevance on the RFC of her ability to perform certain activities. Doc. 14, at 2–3. This argument is forfeited because Sheward raised it for the first time in her reply brief. *See Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir.

*Burley v. Comm'r of Soc. Sec.*, No. 4:23-cv-218, 2023 WL 9604195, at *16 (N.D. Ohio Dec. 20, 2023) (the ALJ's characterization of the claimant's treatment as conservative was accurate since it "required no associated emergent, inpatient, or day program treatment related to her mental health"), *report and recommendation adopted*, 2024 WL 1297554 (N.D. Ohio Mar. 27, 2024). The ALJ also commented that Sheward stopped seeing a psychiatrist and thereafter obtained her medication from her primary care doctor. Tr. 27; *see also Blacha v. Sec'y of Health & Hum. Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) (claimant's failure to seek treatment undercut complaints of disabling symptoms).

And Dr. Dubey's exam findings could be characterized as "mostly normal"—at least it is not a mischaracterization to say so. *See* Tr. 746 (Dr. Dubey's "normal" exam findings showing unremarkable hygiene, appropriate dress, no unusual motor activity, coherent and normal speech, logical thoughts, intact orientation, alert and responsive behavior, no attention problems, unremarkable recall of past and recent events, no need for repeated questions or directions, appropriate performance on serial sevens, ability to "do six digits forward," average math ability, and appropriate abstraction ability, versus "abnormal" findings of minimal eye contact, somewhat tense and anxious appearance, inability to perform "digits backward," below-average general

_____

2018) ("Time, time, and time again, we have reminded litigants that we will treat an 'argument' as 'forfeited when it was not raised in the opening brief.'") (citation omitted)).

fund of knowledge, delayed recall of one-out-of-three items, and low-average cognitive functioning "at this time.").

To the extent that the ALJ referenced "mostly normal exam findings" throughout the record when evaluating Dr. Dubey's opinion, Tr. 29, the ALJ elsewhere in her decision detailed evidence showing that Sheward had some abnormal findings throughout the record, Tr. 26–27, but that her exam findings improved with treatment and medication, Tr. 26, 27 (the ALJ observing that "[r]ecords from Semur Rajan, M.D., in September 2023 noted the claimant had improved quite considerably."). Tr. 28. The ALJ observed that Sheward's greater abnormal exam findings occurred at a time in 2020 when she had not had counseling or medication and was just starting treatment, and, in 2022,[8] contemporaneous with the then-recent deaths of her husband and father. Tr. 26; *see also* 28 (the ALJ commenting that "[t]he majority of [Sheward's] reported symptoms understandably stemmed from the deaths of her husband and father, which were in close proximity [to each other]."). The ALJ remarked that Dr. Dubey concluded that Sheward's symptoms "were likely to improve as her situational stressors stabilized, and she went through the appropriate grieving process." Tr. 27. Finally, the ALJ noted that "other medical records typically noted normal mental status findings including normal alertness, orientation, mood, recent and remote memory, affect,

---

[8]     The record shows a two-year gap in treatment from January 2020 to February 2022. *See, e.g.*, Doc. 9, at 20 (Sheward's brief).

knowledge, attention, insight, and judgment," Tr. 27 (citing "Ex. 1F; 2F," *i.e.*, Tr. 470, 474, 486, 491, 495, 499, 504), and that Sheward "had generally normal behavior with both familiar and unfamiliar medical providers," Tr. 28.

Next, Sheward complains that the ALJ "did not incorporate the limitations of Drs. Dietz, Smith, and Dubey into the RFC finding." Doc. 9, at 14. But she doesn't identify what limitations these doctors assessed that she believes the ALJ did not, but should have, incorporated. Sheward has therefore forfeited this argument.[9] *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed [forfeit]ed. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted).

Later in her brief,[10] Sheward notes that Dr. Dubey found that Sheward's "attention, memory and mood issue . . . would create some frustration for her, coworkers and supervisors." Doc. 9, at 22 (citing Tr. 749). Sheward posits that "[t]his limitation goes beyond the frequency of interaction but indicates that

---

[9]     Defendant, in his brief, asserted that the ALJ's RFC "was mostly consistent with the state agency reviewers' opinions"; detailed the reasons why; and asserted that any potential error as to a "pace" restriction would be harmless. Doc. 11, at 14 n.10; *see also* Tr. 65–66 (vocational expert testimony). In her reply brief, Sheward did not address this argument. So even if Sheward hadn't forfeited this state-agency-reviewer argument, any such error would be harmless for the reason Defendant states and which Sheward has not disputed.

[10]    Rather than presenting argument about the ALJ's evaluation of each doctor's opinion in defined passages, Sheward weaves all of her arguments about all of the doctor's opinions together throughout her brief.

[Sheward] would have difficulties with the actual interaction with others." Doc. 9, at 22. It's not clear what Sheward means by "actual" interaction with others or how this would be inconsistent with the ALJ's RFC finding limiting Sheward to occasional interaction with coworkers, supervisors, and the general public, Tr. 24. In any event, the ALJ accurately described Dr. Dubey's opinion as "a bit vague as to what is meant by 'some difficulties.'" Tr. 29. This is an acceptable reason to discount an opinion. *See Woodard v. Comm'r of Soc. Sec. Admin.*, No. 5:22-cv-1728, 2023 WL 6005004, at *10 (N.D. Ohio July 27, 2023) ("Opinions that express functional limitations in vague terms can be discounted as not describing any functional limitations at all.") (citing *Quisenberry v. Comm'r of Soc. Sec.*, 757 F. App'x 422, 431 (6th Cir. 2018)), *report and recommendation adopted*, 2023 WL 5842016 (N.D. Ohio Sept. 11, 2023); *see also* 20 C.F.R. § 416.945(a)(1) (defining a claimant's RFC as "the most you can still do despite your limitations.").

Sheward writes, "[t]he ALJ also found consultative physical examiner Dr. Weaver's 'commentary on the claimant's mental health, which was outside the scope of his examination with the claimant', to be less persuasive, but Dr. Weaver assessed multiple abnormal findings on examination." Doc. 10, at 14, 17 (citing Tr. 30, 734–43). Sheward does not dispute that Dr. Weaver was tasked with conducting a *physical* consultation exam. *See* Tr. 30, 738. This was therefore an appropriate topic for the ALJ to consider. *See* 20 C.F.R. § 416.920c(c)(4) (ALJ considers the specialization of the source; "a specialist may

be more persuasive about medical issues related to his or her area of specialty than the medical opinion … of a medical source who is not a specialist in the relevant area of specialty."); *Adams v. Massanari*, 55 F. App'x 279, 284 (6th Cir. 2003) ("the ALJ may discredit the opinion of a physician that is outside her area of expertise") (citing *Turley v. Sullivan*, 939 F.2d 524, 527 (8th Cir. 1991)); *Behnke v. Comm'r of Soc. Sec.*, No. 1:10-cv-2105, 2011 WL 5519856, at *2 (N.D. Ohio Nov. 10, 2011) (finding that the ALJ appropriately discounted a medical opinion in part because the doctor was "was outside her area of expertise when it came to mental assessment").

Moreover, the ALJ explained why he discounted Dr. Weaver's opinion that Sheward would "probably be limited" while performing certain activities due to physical and mental reasons—it was "vague and undefined and d[id] not state to what degree or how she would be limited in functional terms." Tr. 30, 738; *see, e.g.*, 20 C.F.R. § 416.945(a)(1) (defining a claimant's RFC as "the most you can still do despite your limitations."); *Woodard*, 2023 WL 6005004, at *10. Finally, the ALJ acknowledged Dr. Weaver's observations about Sheward's mental health, Tr. 27, 30, so Sheward's assertion that the ALJ "did not consider the support provided by Dr. Weaver," Doc. 9, at 17, is belied by the decision, which shows otherwise.

Sheward points out that the ALJ found treating source Dr. Rajan's opinion "not persuasive for many reasons" and accuses the ALJ of mischaracterizing the record. Doc. 9, at 15 (citing Tr. 30). The ALJ discussed

Dr. Rajan's opinion and explained:

> This opinion is not persuasive for many reasons. The findings are not supported by the very conservative treatment and objective findings overall. Dr. Rajan indicated he had only seen the claimant a few times for medication management. Overall, the record shows conservative treatment. The claimant responds overall well to medication. There is little psychiatric therapy or counseling, and no inpatient or emergent treatment. Mental status examinations with her medical providers are generally unremarkable. There is no evidence to support the extreme off task or absences. Also, the sit, stand, walk, and other physical limitations are not what Dr. Rajan typically treats the claimant for and is beyond his specialty. He indicated the claimant could lift and carry more than 100lbs., which is clearly inconsistent with her lumbar impairment. He indicated the claimant could concentrate for less than five minutes. However, that is inconsistent with her reports of being able to carry out her own daily activities including shopping, managing money, taking medications, maintaining a schedule, driving, and doing paperwork. His own brief examinations do not support such severe limitations. His opinion is also internally inconsistent. For example, he cited "mostly mental" findings to support sitting, standing, and walking limitations. Similarly, Dr. Rajan indicated the claimant had no postural or environmental limitations but also marked the boxes labeled "never" for each activity. This adds a level of uncertainty to his opinion. Therefore, I do not find it persuasive.

Tr. 30.

Sheward asserts that the ALJ's comment that "[m]ental status examinations with her medical providers are generally unremarkable" is a mischaracterization. Doc. 9, at 15. Even if this could be said to be a

mischaracterization, which Sheward has not shown for the reasons explained above, the ALJ cited eleven other reasons why she discounted Dr. Rajan's opinion, and these reasons support the ALJ's explanation. Tr. 30. Sheward contends that the ALJ "also erred when failing to cite to any contradicting evidence when finding, '[t]here is no evidence to support the extreme off task or absences.'" Doc. 9, at 15. But the ALJ cannot cite evidence that does not exist. Moreover, the ALJ cited Sheward's ability to perform certain tasks as inconsistent with an inability to maintain attention and concentration for more than five minutes, Tr. 30, which goes to off-task behavior.

Sheward's additional arguments fare no better. Sheward argues that the ALJ's evaluations of the opinions of Dr. Deitz, Dr. Smith, Dr. Dubey, and Dr. Weaver were all "inaccurate and internally inconsistent" because these doctors' opinions "all contained limitations more significant than included in the RFC finding." Doc. 9, at 18, 22. But Sheward concedes that "an ALJ is not required to rely upon a medical opinion and is not required to adopt a medical opinion verbatim." Doc. 14, at 1; *see, e.g., Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 226 (6th Cir. 2019) ("No bright-line rule exists in our circuit directing that medical opinions must be the building blocks of the residual functional capacity finding"). Sheward's references to an ALJ's duty "to build an accurate and logical bridge," Doc. 9, at 10, 11, 12, 15, and the ALJ's duty to "explain how the record supports the RFC finding," Doc. 9, at 21, do not show that the ALJ erred—for the reasons explained above, the ALJ's decision as a

29

whole provided sufficient articulation for the Court to review.

Finally, Sheward recites evidence and provides analysis of why she believes that all of the doctors' opinions were more persuasive than the ALJ found them, *see, e.g.*, Doc. 9, at 20, 23, but citing evidence and disagreeing with the ALJ's conclusion does not show that the ALJ's decision lacks substantial evidence, *see, e.g., Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997) ("The decision of an ALJ is not subject to reversal, even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ.").

### B. Physical impairments

Sheward argues that the ALJ erred when she evaluated the opinions of the state agency reviewers, Drs. Siddiqui and Bolz. Doc. 9, at 23. She contends that the ALJ "did not discuss the evidence reviewed" by the doctors and that the ALJ "made no findings under the supportability factor." *Id*. at 23–24.

But the ALJ did both of these things. Elsewhere in her decision, the ALJ discussed the same evidence that the doctors reviewed. *See, e.g.*, Tr. 25 (ALJ discussing Sheward's: 2018 emergency room visit and lumber x-ray; January 2019 visit for back pain, including Sheward's refusal of steroid treatment, muscle relaxant, and physical therapy and her request to see a neurologist; 2019 visits with Dr. Bauer, including Sheward's normal gait, "mild to benign exam[] findings," and trigger point injections, which were helpful; and June 2022 consultative exam with Dr. Weaver); Tr. 77–79 (state agency record

showing the evidence Drs. Siddiqui considered, including Sheward's 2018 lumbar x-ray, refusal of steroid, muscle relaxant, and physical therapy; exams showing full strength and a normal gait; lack of assistive device; and Dr. Weaver's exam). And when she evaluated Drs. Siddiqui's and Bolz's opinions, the ALJ explained that Sheward's ability to perform light work, as found by the doctors, was "supported by the lack of significant objective findings, improvement with conservative treatment, normal gait, [and] no assistive device." Tr. 28; *see also* Tr. 82 (Dr. Siddiqui indicating that Sheward could perform light work and citing in support Sheward's full strength and lack of assistive device).

Sheward also challenges the ALJ's evaluation of Dr. Weaver's opinion. Doc. 9, at 24. The ALJ discussed Dr. Weaver's opinion as follows:

> Following the physical consultative examination, Dr. Weaver concluded the claimant's ability to do physical activities included the following: in view of her low back problems and mental difficulties, she would probably be limited in the performance of physical activities involving sustained sitting, standing, walking, lifting, carrying, following directions, and travel; and would probably be able to perform physical activities involving handling objects, speaking, and hearing (Ex. 7F). This is less persuasive. Stating the claimant probably would be limited in performance of physical activities is vague and undefined and does not state to what degree or how she would be limited in functional terms.

Tr. 30. Sheward complains that "the ALJ did not identify an inconsistency with the opinion or otherwise explain how the opinion was unsupported." Doc. 9, at 24. But Dr. Weaver's opinion gave the ALJ little to evaluate, as the ALJ

31

explained. This goes to the supportability factor. *See, e.g., Maldonado v. Comm'r of Soc. Sec.*, No. 1:24-cv-415, 2025 WL 1104886, at *22 (N.D. Ohio Apr. 14, 2025) (a doctor's "vague" opinion goes to the supportability factor). Indeed, it is questionable whether Dr. Weaver's opinion could be considered a medical opinion at all. *See* 20 C.F.R. § 404.1513(a)(2) (defining a "medical opinion" as "a statement from a medical source about what [claimants] can still do despite [their] impairment(s) and whether [they] have one or more impairment-related limitations or restrictions" in their ability to perform the physical, mental, or other demands or work).

In any event, given the fact that the ALJ's RFC limited Sheward to performing light work, which could be said to be consistent with Dr. Weaver's opinion—Sheward has not persuasively argued otherwise[11]—any purported error would be harmless. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (an ALJ's error evaluating opinion evidence is harmless when the ALJ's RFC is consistent with the opinion).

---

[11]     Sheward asserts that Dr. Weaver "assess[ed] limitations sitting, standing, walking, lifting, and carrying that were not included in the RFC finding and incompatible with the amount of standing, walking, lifting, and carrying required for light work." Doc. 9, at 24 (citing Tr. 738). But "[s]aying it does not make it so." *GTE Serv. Corp. v. FCC*, 205 F.3d 416, 426 (D.C. Cir. 2000). Sheward hasn't explained *why* Dr. Weaver's opinion that Sheward "would probably be limited in the performance of physical activities involving sustained sitting, standing, walking, lifting, [and] carrying" is incompatible with light work. Moreover, the vocational expert at the hearing testified that if an individual with Sheward's RFC was instead limited to four, rather than six, hours of standing and walking, and even if the limitation amounted to a sit-stand option, there were still jobs that such an individual could perform. Tr. 70–71.

Finally, Sheward challenges the ALJ's comment, when evaluating Dr. Rajan's opinion, that the "the sit, stand, walk, and other physical limitations are not what Dr. Rajan typically treats the claimant for and is beyond his specialty." Tr. 30. Sheward asserts that Dr. Rajan is a board-certified surgeon and current primary care physician. Doc. 9, at 24 (citing Tr. 768). But she has not shown that the ALJ's statement that Dr. Rajan typically treated Sheward's mental, rather than physical, problems is inaccurate, and the record supports the ALJ's statement. *See* Tr. 765–66, 841–43. Sheward also hasn't shown that Dr. Rajan is an orthopedic surgeon, rather than a general surgeon, so she has not shown that the ALJ's specialty comment regarding Dr. Rajan's assessment of Sheward's lumbar spine-related limitations was inaccurate.

All told, Sheward has not shown that the ALJ erred when evaluating the medical opinion evidence.

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: July 15, 2025

_/s/ James E. Grimes Jr._
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).